# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
September 7, 2022 Session

## STATE OF TENNESSEE v. GLENN SEWELL

**Appeal from the Criminal Court for Shelby County**
**No. 12-03950            Jennifer Johnson Mitchell, Judge**

_____

### No. W2021-00023-CCA-R3-PC

_____

Petitioner, Glenn Sewell, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claim of ineffective assistance of counsel at trial. Following our review of the entire record and the briefs and oral arguments of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER, and JOHN W. CAMPBELL, SR., JJ., joined.

Josie S. Holland, Memphis, Tennessee (on appeal); David Huggins (at trial) for the appellant, Glenn Sewell.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Petitioner was indicted by the Shelby County Grand Jury for two counts of aggravated assault (counts one and two), three counts of vandalism over $1,000 but less than $10,000 (count three, four, and seven), one count of theft of property over $1,000, but less than $10,000 (count five), and one count of vandalism of over $500 but less than $1,000 (count six). A jury trial was held on the seven counts. The facts of this case as summarized on direct appeal are as follows:

This case arose after Suzie Doyle's 1994 black Chevrolet Silverado pickup truck was stolen. Ms. Doyle testified that on February 14, 2012, she parked her truck in a Kroger parking lot before going to work. When she finished work and returned to the parking lot, she discovered that her truck was not there. Ms. Doyle had one set of keys to the truck, and her husband had the spare set. She did not leave the keys in the ignition of the car, and her husband did not use his spare set of keys to take the vehicle. She called police to report the truck as stolen.

Officers of the Shelby County Sheriff's Office in the "Alert Unit," which dealt with retail and other types of theft, developed [Petitioner] as a suspect and began to investigate various locations where [he] was either known to frequent or had family members. Detective Raoul Gonzalez testified that when he drove by an address on Beowolf Glade Cove, he spotted the stolen pickup truck in a driveway. Detective Gonzalez immediately notified members of the Alert Unit that he had located the vehicle. Officers arrived at the scene to set up surveillance of the vehicle and to arrest [Petitioner] once he entered the vehicle. Detective Gonzalez, along with Detective David Ballard, Sergeant Barry Clark, and other officers, parked on Glen Birnie, a street perpendicular to Beowolf Glade Cove. Sergeant Clay [Aitken] parked at the end of Beowolf Glade Cove to observe the vehicle. Detective Gonzalez was driving a silver Chevrolet Silverado truck, and Sergeant [Aitken] was driving a black Chevrolet Silverado truck.

When Sergeant [Aitken] observed [Petitioner] walking toward the vehicle, he issued the "take-down signal." Detectives Gonzalez and Ballard testified that the plan was to use their own vehicles to box [Petitioner] into the driveway and prevent him from fleeing, with Detective Ballard to pull in behind the truck and Detective Gonzalez to pull in front of the truck. Detective Gonzalez began driving across the yard to get in front of [Petitioner]'s vehicle once he received the take-down signal. He saw

[Petitioner] get into the stolen vehicle, made eye contact with [Petitioner] while he was in the truck, and heard "the engine at wide open throttle." Detective Gonzalez testified that once he pulled in front of [Petitioner], [Petitioner] accelerated forward, hitting Detective Gonzalez's driver's side door with Ms. Doyle's vehicle.

Detective Ballard testified that once he received the take-down signal, he pulled into the driveway behind the stolen pickup truck, stopping about "three inches from the bumper" of the pickup. Detective Ballard exited his vehicle and began to give commands to [Petitioner], at which point [Petitioner] gave Detective Ballard "kind of a grin" and "jumped in the truck." Detective Ballard got back into his vehicle and applied the brake, believing that [Petitioner] was going to strike his vehicle. Instead, [Petitioner] placed the truck in drive and started toward the house before making a sharp left turn to cut across the yard. Detective Ballard testified that Detective Gonzalez had not arrived in front of [Petitioner]'s vehicle before [Petitioner] started driving but that he was instead pulling along side of the truck when his car was hit. Although Detective Gonzalez testified that he had driven in front of [Petitioner]'s vehicle before [Petitioner] began driving, both detectives agreed that [Petitioner] struck Detective Gonzalez's vehicle.

After striking Detective Gonzalez's truck, [Petitioner] continued driving, proceeding through the yard of James Smithmier and toward the street. Detectives Ballard and Gonzalez drove through the yard as well in pursuit of [Petitioner]. [Petitioner] hit Mr. Smithmier's mailbox before driving onto Beowolf Glade Cove, where Sergeant [Aitken] had initially set up surveillance. Both detectives testified that [Petitioner] struck Mr. Smithmier's mailbox.

When [Petitioner] began his flight, Sergeant [Aitken] had started to drive toward [Petitioner] from the end of Beowolf Glade Cove. As a result, the two vehicles were on a collision course once [Petitioner] drove his truck onto the street. Sergeant [Aitken] swerved his vehicle to avoid a head-on collision, but [Petitioner] struck the side of Sergeant [Aitken]'s vehicle.

After striking Sergeant [Aitken]'s vehicle, [Petitioner] proceeded to drive through the yard of James Walker. He smashed through a ten-foot section of Mr. Walker's fence and caused damage to the side of the house, the gutter, flower beds, and a wooden swing before crashing the pickup truck into a tree

and attempting to flee on foot. Officers apprehended [Petitioner] shortly after he exited his vehicle.

After [Petitioner]'s arrest, officers contacted Ms. Doyle to inform her that they had recovered her pickup truck. She testified that she paid "about $5,400" for the pickup truck and estimated that she spent "at least $3,000" repairing the truck after it was stolen and damaged.

Both Mr. Smithmier and Mr. Walker testified regarding the damage to their property. Mr. Smithmier testified that on the day of the incident, he viewed his mailbox in the street with mail strewn everywhere. Mr. Smithmier spent $98 on a new mailbox, and he purchased concrete and dug a hole for the mailbox. Mr. Walker testified that a photograph of Ms. Doyle's truck wrecked into a tree was taken in his backyard. He estimated that the cost of repairs to his damaged property was "roughly" $3,250. The State introduced an invoice showing that the total cost of the repairs to Mr. Walker's property was $3,215.64.

Tim Albin testified that he worked for the Shelby County Sheriff's Office Fleet Operations. He testified that the vehicles driven by Detective Gonzalez and Sergeant [Aitken] were fairly new vehicles that did not have any prior wrecks or dents. The State introduced an itemized bill showing that the cost of the parts, labor, and paint supplies to repair Detective Gonzalez's vehicle was $1,870.53. The State also introduced an itemized repair bill for Sergeant [Aitken]'s vehicle, and the total cost of the parts, labor, and paint supplies was $1,497.78.[1]

*State v. Glenn[2] Sewell,* No. W2014-00984-CCA-R3-CD, 2015 WL 1932287, at *1-2 (Tenn. Crim. App. Apr. 29, 2015) (footnote omitted).

The jury found Petitioner not guilty of aggravated assault of Detective Gonzalez and of Sergeant Aitken in counts one and two. In count three, the jury found Petitioner guilty of the lesser offense of vandalism of $500 or more to Detective Gonzalez's truck. In count four, the jury convicted Petitioner as charged of vandalism of $1,000 or more to Sergeant

---

[1] Although the trial record was not made part of the appellate record, it was part of the record in Petitioner's direct appeal. Accordingly, we take judicial notice of this fact. *Phillips v. State,* 647 S.W.3d 389, n.4 (Tenn. 2022) (quoting *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987) ("The courts may take judicial notice of the court records in an earlier proceeding of the same case and the actions of the courts thereon").

[2] Although it is spelled differently in the direct appeal opinion, we will utilize the spelling of Petitioner's first name as reflected in the trial and post-conviction records.

Aitken's truck. In count five, the jury convicted Petitioner as charged of the theft of Ms. Doyle's truck. In count six, the jury convicted Petitioner of the lesser offense of vandalism less than $500 to Mr. Smithmier's mailbox. And in count seven, the jury found Petitioner guilty as charged of vandalism to Mr. Walker's property in an amount more than $1,000but less than $10,000.

At sentencing, Petitioner's presentence report was introduced and revealed that Petitioner had been "accepted into the Warriors Center Program." While Petitioner provided the probation officer preparing the report with the acceptance letter from Charles Leichner dated February 2, 2013, the letter was not attached to the presentence report. Petitioner also reported that he first consumed alcohol at age eleven and began smoking marijuana at age thirteen. He began using heroin at age eighteen and continued to use it daily until February 2012. He had not undergone any treatment program.

The State submitted copies of certified judgments reflecting twelve prior felony convictions and relied on seven of the prior felonies for purposes of enhanced punishment. Petitioner's criminal record began at age seventeen and continued nearly unabated to age thirty-two. The judgments also reflected two separate instances of probation being revoked. During his allocution, Petitioner pleaded for "mercy" and referenced his issue with drugs: "I've never robbed nobody, beat up nobody, and like [trial counsel] said, I've got a drug problem. I'm sorry for what I did." The trial court recognized that Petitioner had a drug problem, but observed that Petitioner continued to engage in an "anti-society lifestyle" despite receiving probation multiple times to address his issues with drugs.

Based on his criminal record, Petitioner was classified as a career offender for sentencing on the felony counts. The trial court imposed twelve-year sentences for the convictions in counts four, five, and seven; a six-year sentence for the conviction in count three; and a sentence of eleven months and twenty-nine days for the misdemeanor conviction in count six. The trial court ordered the sentences in counts four, five, and seven to be served consecutively to each other and concurrently with the sentences in counts three and six, for a total effective sentence of thirty-six years.

This court affirmed Petitioner's convictions on direct appeal. *Id.* at *1. Petitioner subsequently filed an application for permission to appeal, which the Supreme Court denied on August 14, 2015. Petitioner filed a pro se petition for post-conviction relief which was stamped filed by the trial court on September 1, 2016. The State filed a motion to dismiss the petition on the grounds that it was untimely filed. The record includes a minute entry on May 12, 2017, indicating that the post-conviction court heard and denied the motion. The reasons for the denial of the motion are not in the record; however, the record shows Petitioner verified under oath that he gave the post-conviction petition to prison authorities to mail on August 16, 2016, which would be considered timely filed.

An amended petition was filed by appointed counsel. In his petition and amended petition, Petitioner claimed that trial counsel failed to communicate with Petitioner; failed to subpoena two witnesses; failed to request potentially exculpatory evidence; failed to object to the trial court's use of the word "obtained" when charging the jury on theft of property; and failed to have Petitioner evaluated for competency and diminished capacity. An evidentiary hearing was held over two days, September 13, 2019, and November 7, 2019.

At the September 13, 2019 post-conviction hearing, Sergeant[3] Richard "Clay" Aitken, of the Shelby County Sheriff's Office ("SCSO") testified regarding the events of the case. Sergeant Aitken confirmed that he did not testify at the trial because he was on leave. He did not recall why he was on leave. This court's opinion on direct appeal reflects that Sergeant Aitken was recovering from surgery at the time of trial. *Glen Sewell*, 2015 WL 1932287, at *1, n.1. Sergeant Aitken did not recall being subpoenaed by the defense.

At the time of the crimes, Sergeant Aitken was the plain clothes supervisor in the retail theft crimes unit which "had been looking for [Petitioner] for awhile." Petitioner was also wanted by the narcotics division. Sergeant Aitken was canvassing the Lakeland-Cordova area when he received information that Petitioner had been spotted in a stolen pickup truck which had been seen parked at a residence in Beowolf Glade Cove. Sergeant Aitken was assigned to a gray Chevy Silverado pick-up truck and stationed that vehicle at the dead-end of the cove while his other officers were stationed at the other end of the cove. Sergeant Aitken kept watch at the residence where Petitioner had parked the stolen pickup truck. His plan was to wait for Petitioner to exit the residence and verify Petitioner's identity before giving the other officers the take-down signal.

Once he confirmed Petitioner's identity, Sergeant Aitken gave the take-down signal as planned. The other officers blocked Petitioner's exit in order to stop him. Petitioner saw that he was surrounded but jumped into the stolen truck and tried to flee. He first hit Detective Gonzalez's truck, then drove straight toward Sergeant Aitken. Sergeant Aitken swerved to avoid a head-on collision. Petitioner hit the front corner passenger side of Sergeant Aitken's truck. Sergeant Aitken testified that he was required to inspect his assigned truck daily for any damages. He denied that there was any damage to his assigned truck before he was hit by Petitioner.

Officer John Sturgeon, a crash investigator with the traffic division of the SCSO, testified that he was dispatched to the scene to photograph damage to the vehicles. Investigator Sturgeon explained that in general, he is dispatched to a vehicle crash site

---

[3] At the post-conviction hearing, this witness had been promoted to the rank of captain. For purposes of this opinion, this court refer to his rank at the time of the crimes.

when there is uncertainty on whether to classify the crash as intentional or accidental. If a crash is deemed accidental, Officer Sturgeon testified that he conducts an investigation of the crash and prepares a traffic or crash report. In this instance, once he learned that the damages to the person's yard and the law enforcement vehicles were the intentional acts of a fleeing suspect, Officer Sturgeon had no role in the case other than to take photographs. He maintained both on direct and cross examination that he did not prepare a report of the crash in this case because it was not deemed accidental.

When questioned about a "traffic report 186" that was discussed at trial, Officer Sturgeon acknowledged that "186" was his call number at the time he was dispatched to the scene but expressed confusion regarding any reference to a crash report for this case:

> That doesn't make any sense, because that is not the way our crash reports are numbered. Our crash reports are numbered with the letters W-C and then the first three digits are the year that they are done, so it would have been WC12, and then it would have fallen in order with whatever the computer assigned it as to which crash report it was assigned to for that year.

At the November 7, 2019 hearing, Petitioner testified about his post-conviction claims. He acknowledged that he was acquitted of the two aggravated assault counts involving Sergeant Aitken and Detective Gonzalez. His trial counsel worked in the Public Defender's Office, and Petitioner recalled that trial counsel had died after the trial.

Petitioner testified that trial counsel was ineffective because he failed to communicate with him. Petitioner wrote trial counsel nine letters from the end of 2012 through 2014. For each letter he wrote to trial counsel, Petitioner also wrote a letter to the Board of Professional Responsibility ("BPR"). When post-conviction counsel retrieved trial counsel's file, Petitioner's letters were in the file unopened. Petitioner acknowledged that he met trial counsel in the Shelby County Jail the Friday and Sunday before his Monday trial date. According to Petitioner, each meeting lasted thirty minutes. Petitioner maintained that trial counsel visited him one time after trial counsel was ordered to do so by the BPR. He reluctantly admitted that he talked to trial counsel about what he wanted done on the case.

Petitioner complained that trial counsel did not subpoena any witnesses but relied instead on the State to call witnesses. Petitioner wanted to call as witnesses all twelve officers who were at the scene to show that the vehicles at issue had pre-existing damage. Petitioner denied that he crashed into the vehicles. He surmised that the officers crashed into each other and testified that the officers gave inconsistent accounts of the facts for the vandalism charges.

As for the two witnesses who testified at the earlier post-conviction hearing, Petitioner agreed that he moved for a continuance so that Sergeant Aitken and his fellow officers could testify at trial. Petitioner recalled that the trial court denied the motion because there were no grounds to support a continuance. According to Petitioner, Sergeant Aitken "had a hernia removed two weeks" before the trial. He could not understand why Sergeant Aitken was unavailable for trial given that "people coming out of the hospital with heart surgery in two or three days and it had been two weeks and [Sergeant Aitken} didn't show up." Petitioner insisted that calling Sergeant Aitken to testify would have undermined the outcome of his trial because his testimony on key facts was "inconsistent." Specifically, Petitioner testified that Sergeant Aitken drove a black truck, not a silver or gray truck as he testified to at the earlier post-conviction hearing. Also, Sergeant Aitken testified that he got hit in the front whereas Petitioner maintained that Sergeant Aitken got hit from the back.

Petitioner wanted Officer Sturgeon to testify about "traffic report 186." Although Petitioner believed that there was an actual traffic report, he acknowledged that at the September 13, 2019 hearing, Officer Sturgeon denied completing a report for the case. Petitioner admitted that there was "nothing" he could do "but believe [Officer Sturgeon]" that he did not complete a crash report or conduct an investigation.

Petitioner also complained that trial counsel failed to secure a forensic evaluation to determine Petitioner's competency and to determine whether a diminished capacity defense could be asserted. Petitioner stated that an evaluation was necessary based on his history of drug use and "mental problems." On cross-examination, Petitioner based his desire for a forensic evaluation on the grounds that he attended resource classes when he was in school and had been prescribed a variety of medications during his incarceration. Petitioner clarified that he began taking medication before the trial. When Petitioner was incarcerated on other convictions in 1998 or 2002, he saw a mental health professional not as part of routine treatment but when he "kind of wigged out" while he was incarcerated. He was placed in a "tank" as part of the treatment. He testified that he was not returned to the regular ward but released. He did not seek psychiatric treatment or continue to take medication upon his release.

Petitioner acknowledged that he was designated as a career offender for purposes of sentencing. Petitioner testified that he had never undergone drug treatment. Heroin was his admitted "drug of choice." He had never been convicted of a drug offense but had many prior convictions for theft which were the result of his drug use. He stated that he made the trial court aware of his history of drug use. He also informed trial counsel that he had been accepted into the drug rehabilitation program at the Warriors Center,.

Petitioner also testified that trial counsel was ineffective for failing to renew his objection when the trial court used the word "obtained" when charging the jury on the theft count. He explained that trial counsel initially objected to including "obtained" in the theft count and the trial court deleted it from the jury charge. However, the trial court used "obtained" when charging the jury, but trial counsel did not renew the objection.

Petitioner confirmed that the jury acquitted him of the two aggravated assault charges involving the two officers and that he was found guilty of lesser offenses on other counts. Based on the verdicts, he agreed that trial counsel did have "some success with the jury."

Following Petitioner's testimony, the parties and the post-conviction court discussed the date of trial counsel's death. Post-conviction counsel explained that because trial counsel died before he was appointed in late 2016, he was not able to discuss the case with trial counsel.

The post-conviction court took the case under advisement. On August 13, 2020, the post-conviction court re-opened the proof for the purpose of supplementing the record with copies of the nine unopened letters found in trial counsel's file. The record was also supplemented with four letters from the BPR to trial counsel found in trial counsel's file.

In the first letter dated September 3, 2012, Petitioner told trial counsel that the "crash report" made by "traffic unit 186" or "Deputy Sturgeon" was missing from his discovery package. He believed that the damage to Sergeant Aitken and Detective Gonzalez's vehicles occurred when "the deputies hit each other, and/or they hit me." He concluded this letter for a "pray[er]" for trial counsel to "get the Aggravated Assaults out of the equation."

In the second letter, dated September 23, 2012, Petitioner reiterated his belief that "the officers in the 2 trucks hit each other and are attempting to blame it on [him]" because he had "look[ed] closely @ the pictures of the 2 police trucks involved, and the pictures of the fire trucks from the scene[.]" He accused the officers of "increase[ing] the charges against him" via "case stacking." He once again stated that the "traffic unit 186" report by "Deputy Sturgeon" was missing from discovery. He also expressed his "inten[t] to fight the charge of Aggravated Assault to the fullest possible."

In the third letter, dated December 12, 2012, Petitioner asked trial counsel to send him copies of the indictment and the discovery package. He informed trial counsel that he would be filing several motions after February 1, 2013. In the fourth letter, dated January 12, 2013, Petitioner described the specific motions he would be filing, including a motion

for appointment of new counsel, and stated that he was going to complain to the BPR because trial counsel had not done what he had asked him to do.

In the fifth letter, dated March 5, 2013, Petitioner informed trial counsel that the court refused to hear his pro se motion for discovery and production of documents because he was still represented by counsel. He then asked trial counsel to file the motion and asked for a list of documents including "the traffic unit 186 report . . . written by Deputy Sturgeon[.]" He also informed trial counsel that he had been accepted to the "Warriors Center long term Recovery Program" and attached a copy of the acceptance letter dated February 26, 2013, from Charles Leichner, the Assistance Intake Coordinator, indicating that the Warriors Center is "a one year Faith-Based Rehabilitation Program that reaches out to men battling substance abuse and other life controlling problems." In order to complete Petitioner's acceptance in the center's long-term rehabilitation program, Mr. Leichner requested "a signed court order document stating [Petitioner]'s being released into the [program] and the length of time he is to stay in the program."

In a short letter, Petitioner's sixth, dated May 19, 2013, Petitioner asked trial counsel why he had not visited him after he had written him "number of times" to do so and asked trial counsel to visit him "ASAP." In another short letter dated October 3, 2013, after the trial and before sentencing, Petitioner informed trial counsel that "probation" had not visited him. He again informed trial counsel that he had been accepted into the Warriors Center and expressed his desire to be placed in the program as his sentence.

In the eighth letter, dated February 2, 2014, Petitioner demanded that trial counsel provide him a copy of the discovery package. Petitioner acknowledged that he told trial counsel to look for "it" but was unable to find "it": "You told me that you would look for it. After you looked for it you said you was unable to find it[.]"

In the ninth and final letter, dated March 16, 2014, Petitioner thanked trial counsel for giving him a copy of the discovery package, but clarified that he wanted trial counsel to print out a "new" copy of the discovery and insisted that trial counsel see him before March 25, 2014, and the motion for new trial.

On November 20, 2020, the post-conviction court entered a comprehensive written order denying relief based on Petitioner's failure to prove his claim of ineffective assistance of counsel. Although the post-conviction court found trial counsel's failure to open Petitioner's letters to be deficient, the court did not find the deficiency to be prejudicial. In terms of the omitted witness claim, the post-conviction court accredited Sergeant Aitken's testimony about the crash and accredited Officer Sturgeon's testimony that no crash report existed in the case. Next, the post-conviction court found no deficiency and prejudice regarding Petitioner's claim that he should have been forensically evaluated to determine

his competency for trial and whether a diminished capacity could be asserted because the claim was unsupported by any proof. Lastly, the post-conviction court found no deficiency and prejudice in trial counsel's decision not to renew an objection to the trial court's inadvertent use of the word "obtained" when charging the jury on theft of property. Petitioner appealed the decision of the post-conviction court. Because the notice of appeal was untimely filed, Petitioner filed a motion to accept a late-filed notice of appeal, which this court granted on January 6, 2021.

## Analysis

On appeal, Petitioner claims that the post-conviction court erred in denying his petition for relief based on the ineffective assistance of counsel because trial counsel failed (1) to communicate with him; (2) to subpoena trial witnesses; (3) to secure a forensic evaluation for Petitioner; and (4) to renew an objection to the trial court's use of the term "obtain" in charging the jury on the theft of property count after the trial court granted the defense request to delete "obtain" from the final jury charge. Because Petitioner failed to prove deficiency and prejudice in trial counsel's performance, the post-conviction court properly denied relief.

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Because the right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee, the denial of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips*, 647 S.W.3d at 400 (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard,* 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State,* 40 S.W.3d 450, 456, n.4 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard,* 604 S.W.3d at 57; *Holland v. State,* 610 S.W.3d 450, 455 (Tenn. 2020).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v.*

*Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick,* 454 S.W.3d at 457 (quoting *Strickland,* 466 U.S. at 688); *see also Baxter v. Rose,* 523 S.W.2d 930, 932-33 (Tenn. 1975). To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 694; *Kendrick,* 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick,* 454 S.W.3d at 458 (citing *Williams v. Taylor,* 529 U.S. 405-06 (2000)).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State,* 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the *fact* of counsel's alleged error by clear and convincing evidence." *Phillips,* 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294 (emphasis in original)); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1).

### *Failure to communicate*

Petitioner argues that the nine letters he wrote to trial counsel which were later found unopened in trial counsel's case file following trial counsel's death, preponderate against the post-conviction court's "broad conclusions" that Petitioner failed to show that trial counsel failed to communicate with Petitioner or was unprepared for trial. In his petition and amended petition, Petitioner claimed that due to this failure, trial counsel was unaware of his demands to locate a crash report and the vehicle repair and accident history of the damaged law enforcement vehicles, to provide another copy of his discovery package, and "to fight the charge of aggravated assault[.]"

On appeal, Petitioner claims that trial counsel's deficiency denied him an alternative sentence. He asserts that because trial counsel did not open his letters, trial counsel "never knew" that Petitioner had been accepted into the Warriors Center and that but for this deficiency, the State would have "negotiated a settlement" of the case or, the trial court would have placed him in the Warriors Center as "an alternative resolution to imprisonment." While Petitioner cites to *Strickland* and the requirement to prove deficiency *and* prejudice, he ultimately argues for presumptive prejudice under *United States v. Cronic,* 466 U.S. 648 (1984). He submits that based on the nine unopened letters,

trial counsel failed to subject the State's case to "meaningful adversarial testing." *Id.* at 659-60.

The State argues that this issue should be reviewed under the two-prong test of *Strickland* because Petitioner suffered no "actual or constructive denial of counsel" for the limited exception of *Cronic* to apply. Under *Strickland,* the State contends that the post-conviction court properly denied Petitioner relief because Petitioner failed to demonstrate that the outcome of his trial or sentence would have been different.

A review of the record shows that Petitioner asserts presumptive prejudice under *Cronic* for the first time on appeal. "Issues not addressed in the post-conviction court will generally not be addressed on appeal." *Walsh v. State,* 166 S.W.3d 641, 645-46 (Tenn. 2005). Accordingly, Petitioner's argument for presuming prejudice is waived. Waiver notwithstanding, we agree with the State that the limited exception under *Cronic* is not applicable in this case. Petitioner argues that his claim meets the second exception identified in *Cronic*: the failure "to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659. The kind of error challenged by Petitioner is the kind of attorney error subject to the two-prong *Strickland* test. *See Bell v. Cone,* 535 U.S. 685, 697-98 (2002). Petitioner is not alleging that trial counsel failed to oppose the State throughout sentencing as a whole. Rather, he submits that trial counsel failed to offer mitigating evidence in support of an alternative sentence. Such a specific error is governed by *Strickland. Id.* at 698 (counsel's failure to offer mitigating proof and waive final argument at capital sentencing hearing subject to *Strickland*). Thus, we will apply the general two-prong test of *Strickland* to resolve this issue.

Under *Strickland,* the question of whether trial counsel's performance was deficient is not at issue here. Rather, at issue is the second prong – whether Petitioner was prejudiced by the deficiency. The post-conviction court held that trial counsel's failure to open Petitioner's letters, while deficient, did not constitute evidence that trial counsel failed to communicate at all or that he was not prepared for trial:

> This court finds that even though the trial attorney did not open the written communication that the Petitioner had sent him during the course of his representation that does not mean that there wasn't any communication at all and it certainly does not mean that the attorney was not prepared for trial. Although this court finds that the trial attorney's performance was deficient in this area, the Petitioner fails to establish that there is a reasonable probability that the result would have been different. As such, Petitioner has failed to establish prejudice and is not entitled to relief on this claim.

We agree with the post-conviction court because the record does not support Petitioner's allegation that trial counsel failed to communicate with him to such a degree that Petitioner was prejudiced by it. Petitioner testified that in addition to the two times he met trial counsel before the trial, he had also met with trial counsel on several days when he had court hearings. Petitioner testified that it was on court days that he told trial counsel about his acceptance into the Warriors Program. He believed trial counsel may have conveyed the same information to the trial court:

> Well, I know I wrote [trial counsel] and asked him and I can't remember if – when we had a court date or something. When I come to court, I would see [trial counsel], obviously, and I would bring it up to him then. I don't never know – I can't remember if he requested it or – I mean, I'd hate to sit here and say that [trial counsel] lied to me a lot, but he would, basically, just tell me whatever I wanted to hear just to push me on. So, I don't ever know – I think he did say he said something to the Court –

> The State:    Okay.

> Petitioner:   – but to be honest with you, I don't know if he did or didn't.

> The State:    So, he indicated that he may have looked into that? He indicated to you that he may have looked into that?

> Petitioner:   Yes, ma'am.

Here, Petitioner's assertion that trial counsel was unaware of Petitioner's acceptance into the Warriors Program is squarely contradicted by his own testimony at the post-conviction hearing. It was also contradicted by the transcript of the sentencing hearing where trial counsel argued that Petitioner is a "drug addict who steals" and is more likely to be a "danger to commerce" than a danger to society. At a minimum, trial counsel's argument at sentencing shows that he understood Petitioner's self-reported problems with drugs which would be the purpose of entering the Warriors Program. Additionally, the sentencing transcript shows that the presentence report contained information about Petitioner's acceptance into the Warriors Program and that the trial court was aware of Petitioner's acceptance. At sentencing, the trial court stated on the record that it had reviewed the presentence report and twice acknowledged Petitioner's issue with drugs. The notation about the Warriors Program was outweighed, however, by Petitioner's extensive criminal record which occupied six pages of the presentence report and identified twelve prior felony convictions including at least two probation violations, all by the age of thirty-four. With such a record, Petitioner was not a favorable candidate for alternative sentencing. *See* T.C.A. § 40-35-102(6)(A) ("a defendant who is being sentenced for a third

or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing"). For the same reasons, Petitioner has not shown that the State was willing to plead to alternative sentencing into the Warriors Program and forgo a prison sentence. Indeed, there was no such evidence. Because Petitioner's acceptance into the Warriors Program had no effect on the manner of his sentence, he has failed to demonstrate prejudice. He is not entitled to relief.

### *Failure to subpoena witnesses*

Petitioner contends that trial counsel's decision to rely on the State to subpoena "necessary" witnesses demonstrated "a lack of diligence" rather than a strategic decision informed by preparation. Although he does not identify the two omitted witnesses and makes no reference to their post-conviction testimonies in the argument section of his brief, we recognize that Petitioner is referring to Sergeant Aitken and Officer Sturgeon who testified at the post-conviction hearing. According to Petitioner, the damage sustained by Sergeant Aitken's and Detective Gonzalez's vehicles were caused by the officers themselves when they crashed into each other while trying to stop Petitioner from evading arrest in his vehicle. On appeal, Petitioner argues that the testimonies of Sergeant Aitken and Officer Sturgeon were so "unremarkable" that they "would have increased the likelihood of acquittal or reduction of charge[s]."

We note that Petitioner's failure to cite to relevant portions of the record is reason alone to consider this issue waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"); *see also In re Cox*, 389 S.W.3d 794, 797-98 (Tenn. Crim. App. 2012). Despite Petitioner's failure to comply with this rule, we will nevertheless address this issue on the merits.

In proving relief for this claim, Petitioner must produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. *Denton v. State*, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing *Black v. State*, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990)). If the post-conviction court determines that the proffered testimony would not have materially aided the petitioner's defense at trial, the post-conviction court is justified in finding that trial counsel was not deficient in failing to call that witness at trial. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008).

On this issue, we begin with the post-conviction court's credibility findings. In denying Petitioner relief, the post-conviction court accredited the testimonies of Sergeant Aitken and Officer Sturgeon:

This court finds that the witnesses' testimony was credible and consistent with other witnesses' testimony who testified during the trial. This court also finds the two witnesses' testimony to be material and would have been admissible at trial, however it was not favorable for the Petitioner and would not have aided the Petitioner had they testified at trial.

First, the post-conviction court found that Sergeant Aitken's testimony did not corroborate Petitioner's theory that Sergeant Aitken's vehicle was damaged before the underlying incident or that the damage was caused by the officers crashing into each other. The post-conviction court's findings regarding Sergeant Aitken's testimony are provided below:

[Sergeant] Aitken testified that he was on leave at the time of trial. He could not recall why he was on leave and does not recall if he received a subpoena from the defense attorney. He testified that he was driving a gray Chevy pick-up truck at the time and he was very familiar with it because it was assigned to him. He testified that the vehicle had no dents or damage prior to this incident.

[Sergeant] Aitken testified that he was the supervisor and was to give the take-down signal after he identified the Petitioner on the scene. When the Petitioner came out of the residence he gave the take-down signal. It was his testimony the Petitioner got into the stolen pick-up truck and ran into Detective Gonzalez'[s] vehicle first. Then he [Petitioner] came toward the witness'[s] vehicle head-on. [Sergeant] Aitken swerved at the last minute to keep from colliding with the Petitioner. [Sergeant] Aitken testified that the vehicle the Petitioner was driving "glanced" [Sergeant] Aitken's vehicle on the front corner and there was some damage to [Sergeant] Aitken's vehicle but it was still drivable.

We defer to the post-conviction court's credibility findings because the evidence does not preponderate against them. Sergeant Aitken's post-conviction testimony was consistent with Detective Gonzalez's trial testimony. Sergeant Aitken identified Petitioner as the person who got into a stolen truck and fled the scene by hitting Detective Gonzalez's vehicle and side-swiping Sergeant Aiken's vehicle. Both officers also denied that their respective vehicles had any damage prior to being hit by Petitioner.

The trial records give a clear picture of trial counsel's strategy in relying on the State's subpoena to call Sergeant Aitken and choosing not to call him under a defense subpoena. The trial transcript reflects that trial counsel was prepared to cross-examine

Sergeant Aitken and learned "on the eve of trial" that Sergeant Aitken would not be testifying. Before opening statement, trial counsel moved for a directed verdict of the aggravated assault count involving Sergeant Aitken because without Sergeant Aitken's testimony, the State would be unable to prove all the elements of aggravated assault as charged in count two and the defense would be unable to cross-examine Sergeant Aitken and whether he was put in fear by Petitioner's actions. Although the trial court denied trial counsel's motion, the court asked the State how it expected to prove aggravated assault in count two:

> With regard to this officer who's not going to be here, what are you -- what are you offering through whomever? I mean, how are you going to prove that he was reasonably in fear of imminent bodily injury without him being here?

Following further discussion between the trial court and the State, trial counsel moved to delete the reference to "obtained" in the indictment for the theft charge. It was during the discussion on deleting "obtained" in the indictment that trial counsel conveyed Petitioner's motion to continue the trial so that Sergeant Aitken could testify. The trial court addressed Petitioner in denying Petitioner's motion for a continuance. The transcript also shows that trial counsel stated his intent to renew a request for a continuance when the State revealed that it was prepared to move forward on the aggravated assault count by calling on the other officers who were present at the scene:

> And if I can't cross-examine to rebut it if they come up here and tell some dramatic reading of oh, he swooned behind the wheel and lurched to the side with a look of terror in his eyes and I can't rebut that with his own testimony where that ain't exactly what happened, then I would renew my request for a continuance. Because if they're going to – they either don't go forward on that count or – because I can't cross examine the – I have a confrontation clause right to cross-examine the witness and I'm being denied that. And therefore, I shouldn't have to go forward on that count.

When trial counsel alternatively asked for time to question one of the officers, Detective Ballard, the trial court granted the request. The trial court also granted trial counsel's request to instruct Detective Ballard before the trial that he was to testify only to what he observed that day concerning Sergeant Aitken, and nothing more. The trial records demonstrate that trial counsel made a strategic decision which greatly benefitted Petitioner. Because he was prepared to cross-examine Sergeant Aitken, trial counsel understood the importance of Sergeant Aitken's testimony on the element of "fear of bodily injury." Without Sergeant Aitken, the State was unable to prove all the elements of aggravated assault which led to the jury's decision to acquit Petitioner of the two aggravated assault

charges.  Trial counsel therefore wisely chose not to renew the request for a continuance for Sergeant Aitken to testify.

Second, the post-conviction court accredited Officer Sturgeon's testimony that no crash report was completed because the crash was intentional, not accidental:

> Officer Sturgeon testified that at the time of trial he was a crash investigator with the traffic department.  He testified that he is usually sent out when the officers are unsure who caused the crash.  Officer Sturgeon testified that in this instance it was determined that the damage was caused by "intentional acts."  Consequently he just took photos of the vehicle. He did not do any investigation. He did not complete a crash report.

Once again, we defer to the post-conviction court's factual findings.  The phantom "crash report 186" was not an actual report but a reference to Officer Sturgeon's call number, 186.  Furthermore, Officer Sturgeon testified consistently with the officers who testified at trial that the damage to the officer vehicles was intentional thus obviating a need for an investigation and a report.  Petitioner's obsession with Detective Gonzalez's trial testimony and references to "186" was debunked by Officer Sturgeon's post-conviction testimony.  Indeed, Petitioner reluctantly admitted that such a report did not exist when confronted with Officer Sturgeon's testimony.  We find Petitioner's concession at post-conviction not at all surprising given what occurred prior to trial.  The trial records show that after Petitioner's motion for continuance was denied, Petitioner asked the trial court for a complete discovery package because the crash report was missing.  Trial counsel described his efforts in trying to locate the report:

> I've gone to Central Records and I received an incident report.  Then they basically stated that there – any crash report, this will be an interdepartmental report.  And they referred me to Detective Gonzale[z], who I spoke to.  And he explained that since this was considered *an intentional act, they didn't do an actual crash report* on this, that the detective who is listed in here is the one who took all the pictures that we have discovery on.  Mr. – I have looked for this.  [The prosecutor] has looked for it.  I've explained to [Petitioner].  I gave him a copy of the incident report just a minute ago, which basically is nothing new that we don't have.

> The Court:    Okay.  So Mr. Sewell, it doesn't exist is all.  What else?

(emphasis added).  The trial records show that trial counsel knew of Petitioner's demand for the crash report as mentioned in his letters and tried to locate it.  Trial counsel cannot be faulted for failing to obtain a report which plainly did not exist.  Therefore, trial counsel

- 18 -

was not deficient in this regard and the post-conviction court's rejection of Petitioner's testimony regarding the report is well-founded and supported by the evidence.

In sum, the record supports the determination by the post-conviction court on this issue. Neither testimony was favorable to his case. Quite the opposite, the trial records show that without Sergeant Aitken and Officer Sturgeon's testimonies, the jury found Petitioner not guilty of two of the most serious charges. This issue is without merit, and Petitioner is not entitled to relief.

### *Failure to secure forensic evaluation*

In his petition and amended petition, Petitioner claimed that his trial counsel was ineffective because he failed to secure a forensic evaluation to determine Petitioner's competency for trial and to pursue a diminished-capacity theory of defense. At the post-conviction hearing, Petitioner testified that he wanted a mental evaluation to make sure he was stable and that he "understood what was going on." On appeal, Petitioner concedes that prejudice was not established but blames his failure on prior post-conviction counsel and Rule 13 of the Tennessee Supreme Court Rules which he asserts is "unconstitutional," and a violation of due process and the Equal Protection Clause.

As to the merits of this issue, the State argues that the post-conviction court properly denied Petitioner relief because he failed to introduce a mental health expert to demonstrate what a forensic evaluation would have revealed. In terms of Petitioner's complaint about Rule 13, the State argues that this complaint must fail because "there is no evidence that the petitioner could not have procured an expert with private funds or that he requested a state-funded expert. Further, the Tennessee Supreme Court has held that there is no constitutional guarantee to that type of funding." We agree with the State on both counts.

First, the post-conviction court properly denied Petitioner relief on the merits of this issue because "[he] failed to offer any proof of competency or diminished capacity at the [e]videntiary hearing. The record as a whole is devoid of any interjections by the parties particularly the petitioner, reflecting any mental illness." The evidence does not preponderate against the post-conviction court's findings because Petitioner failed to present material and favorable expert testimony. *State v. Hall*, 958 S.W.2d 679, 688 (Tenn. 1997) (diminished capacity is "a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state"); *see also Brimmer v. State*, 29 S.W.3d 497, 512 (Tenn. Crim. App. 1998) (quoting *Davis v. State*, 912 S.W.2d 689, 698 (Tenn. 1995)) ("[t]here can be no speculation 'as to what the [expert] evidence would have shown and . . . how it would have benefitted Petitioner'"). Because Petitioner offered no evidence of diminished capacity or a need for a forensic evaluation, we agree with the post-conviction court that trial counsel's performance was neither deficient nor prejudicial.

Second, as the State points out, the record does not show that Petitioner moved to secure a state-funded expert or was unable to secure an expert with private funds. Indeed, Petitioner does not allege that the post-conviction court improperly denied a request for funding for a mental health expert at the post-conviction stage. *Cf. Henry Lee Burrell v. State,* No. M2015-02115-CCA-R3-PC, 2017 WL 943363, at *9 (Tenn. Crim. App. Mar. 9, 2017); *Wesley Jones v. State,* No. W2015-01481-CCA-R3-PC, 2016 WL 4357422, at *22 (Tenn. Crim. App. Aug. 11, 2016); *Klein Adlei Rawlins v. State,* No. M2010-02105-CCA-R3-PC, 2012 WL 4470650, at *14 (Tenn. Crim. App. Sept. 27, 2012). Thus, the issue of expert services for non-capital post-conviction petitioners and the constitutionality of Rule 13 was never discussed below. Under the circumstances, we fail to see how this issue is not waived. *Walsh,* 166 S.W.3d at 645-46.

Waiver notwithstanding, Petitioner has offered no reason or authority to reverse the well-established law in Tennessee that a petitioner in a non-capital case is not entitled to receive state funding for an expert at the post-conviction stage. "In non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved." Tenn. Sup.Ct. R. 13 § 5(a)(2). As cited above, this court has consistently followed the holding in *Davis v. State,* 912 S.W.2d 689 (Tenn. 1995), where our Supreme Court held that "the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." *Id.* at 697. In examining applicable cases decided by the Supreme Court of the United States, as well as both the Federal and Tennessee Constitutions, the Supreme Court determined that "in the absence of a Constitutional right to counsel, there can be no Constitutional right to support services at state expense" for non-capital post-conviction petitioners. *Id.* at 696. The Court also determined that neither due process nor equal protection require expert services for indigent non-capitol post-conviction petitioners in Tennessee. *Id.* at 696. This issue is without merit.

***Failure to object a second time to the inclusion of the word "obtained" in the jury instructions.***

Lastly, Petitioner complains that trial counsel's failure to object a second time to the word "obtained" in the final jury charge for theft of property (count five) rose to the level of ineffective assistance of counsel. In support of this issue, he asks this court to take "judicial notice of the jury instructions as appearing in the trial record of the direct appeal." The State responds that the post-conviction court properly denied this claim because trial counsel "did object, a second time, to the word remaining in the definition of theft – resulting in the word being stricken from the definition – and [trial counsel] was not ineffective for failing to object to the word appearing in other parts of the instructions." In taking judicial notice of the trial records, we agree with the State.

- 20 -

Concerning this issue, the post-conviction court found as follows:

Trial counsel objected originally when the court defined the term "obtained" in its instructions to the jury. The trial court agreed with trial counsel that in this particular case the term "obtained" should be struck. It was agreed by the parties that the phrase "exercised control" should be used. However the Court then used the term "obtained" again while explaining to the jury in its instructions about fixing value to property or services and defined the term "obtained" as "to bring about a transfer or purported transfer of property or of a legally recognized interest therein, whether to the defendant or another."

Petitioner argues that trial counsel failed to object a second time after the Court read and defined "obtained" while reading the jury instructions. Furthermore Petitioner argues that after the Court agreed that the term "obtained" should not be used, presumably due to the potential for unfair prejudice, the Court used the term again and trial counsel failed to object and thus the term "obtained" was part of the jury instruction. This court finds that this does not rise to the level of deficient performance. Trial counsel objected earlier to this same oversight or error made by the court and the court amended the indictment to remove the term "obtained."

Petitioner has failed to show deficient performance as to this issue and thus is not entitled to relief on this claim.

(footnote omitted).

While we agree with the post-conviction court's ultimate conclusion, the trial records show that trial counsel did object a second time when the trial court read the final jury instruction to the jury with the word "obtained." When alerted to the mistake, the trial court agreed with trial counsel and immediately read the correct instruction:

For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: The defendant knowingly *obtained* or exercised control over property owned by the victim, and that the defendant did not have the owner's effective consent, and that the defendant intended to deprive the owner of the property.

Trial counsel:      Your Honor?

| | |
|---|---|
| The Court: | Yes? |
| Trial counsel: | Sorry to interrupt. On the theft of property, obtain is still in the instruction there. It should be stricken out. It should be just exercised control. |
| The Court: | Correct. All right. Let me read that again, please. Theft of property. Any person who commits the offense of theft of property is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: *The defendant knowingly exercised control over property owned by the victim,* and that the defendant did not have the owner's effective consent, and that the defendant intended to deprive the owner of the property. |

(emphasis added). The record clearly does not support Petitioner's allegation of deficiency. This claim is therefore without merit and Petitioner is not entitled to relief.

Because we have taken judicial notice of the trial records, we note that the word "obtained" is "still in the jury instructions" as asserted by Petitioner. "Obtained" is used in the definition of theft: "the definition knowingly obtained or exercised control over property owned by the victim." It is also used in fixing value in the vandalism charges. To the extent Petitioner is challenging the inclusion of the word "obtained" or "obtain" in the written jury charge, the issue is waived. Petitioner proffers no argument as to how the inclusion is deficient and prejudicial and does not direct this court's attention to the relevant portions of the jury charge supporting this claim. "[W]here a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Supreme Court,* 301 S.W.3d 603, 615 (Tenn. 2010); *see also* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

Moreover, we are not convinced on this record there is a reasonable probability the outcome of the proceeding would have been different had trial counsel objected a third time to the superfluous use of "obtained" in the jury instruction. The record is devoid of any evidence that would have allowed the jury to find that Petitioner knowingly obtained Ms. Doyle's truck in Shelby County. She testified that she did not witness Petitioner take her truck from the Kroger parking lot in Atoka, in Tipton County. She only discovered that it was missing when she returned to the parking lot after she finished work. Because her husband did not use her truck, she reported it stolen to the police department. She learned of its discovery nine days later when she received a call from the police. Officers

- 22 -

of the SCSO observed Petitioner get into Ms. Doyle's truck on Beowolf Glade Cove in Shelby County. We are confident the jury reached its verdict on the proper basis. Petitioner has thus failed to establish the necessary prejudice to succeed on his ineffective-assistance-of-counsel claim. He is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE